## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

RODNEY D. TOW,                                    §
Chapter 7 Trustee of AmeriSciences, L.P.,        §
                                                 §
              Plaintiff,                         §        Case No. 4:16-CV-00643
                                                 §
vs.                                              §        Judge Vanessa D. Gilmore
                                                 §
ORGANO GOLD INT'L, INC., *et al.*                §
                                                 §
              Defendants.                        §

## OPPOSITION OF RODNEY D. TOW, CHAPTER 7 TRUSTEE, TO MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS ORGANO GOLD INT'L, INC., ORGANO GOLD ENTERPRISES, INC., AND HOLTON BUGGS

John J. Sparacino
State Bar No. 18873700
Federal ID No. 12551
Vorys Sater Seymour and Pease LLP
700 Louisiana, Suite 4100
Houston, Texas 77002
(713) 588-7000
(713) 588-7050 (fax)
jjsparacino@vorys.com

Steven R. Rech
State Bar No. 16649200
Federal ID No. 15801
Vorys Sater Seymour and Pease LLP
700 Louisiana, Suite 4100
Houston, Texas 77002
(713) 588-7000
(713) 588-7050 (fax)
srech@vorys.com

*Attorneys for Rodney D. Tow, Chapter 7 Trustee of AmeriSciences, L.P.*

## TABLE OF CONTENTS

**Page**

INDEX OF AUTHORITIES ............................................................................................... V

II.      NATURE AND STATE OF THE PROCEEDING ................................................... 1

III.     STATEMENT OF ISSUES AND CONCISE SUMMARY ..................................... 2

IV.      FACTS ..................................................................................................................... 3

      A.      AmeriSciences' Business Operations .................................................... 3

      B.      AmeriSciences Placed Restrictions on IMCs from Using Its Distributor
            Network ................................................................................................... 5

      C.      AmeriSciences' Measures to Safeguard Its Distributor List ................. 6

      D.      AmeriSciences Becomes Insolvent ........................................................ 7

      E.      Organo Gold's Business Operations ....................................................... 7

      F.      Buggs, Cocheu, and Gallardo Initially Discuss Organo Gold Acquiring
            AmeriSciences' Assets ............................................................................ 8

      G.      Buggs, Cocheu, and Gallardo Agree on the Terms of Organo Gold's
            Acquisition of AmeriSciences' Assets .................................................... 9

      H.      Organo Gold's Improper Acquisition of AmeriSciences' Assets .......... 10

      I.      The Organo Defendants, Cocheu, and Gallardo Benefited at
            AmeriSciences' Expense ......................................................................... 12

V.       LAW AND ARGUMENT ........................................................................................ 13

      A.      Standard of Review ................................................................................. 13

      B.      The Estate of AmeriSciences Owns the Causes of Action Asserted in this
            Case ......................................................................................................... 14

      C.      The Evidence in the Record Supports the Trustee's Claims that the Organo
            Defendants Misappropriated AmeriSciences Trade Secrets (Count I) ................. 15

            1.      AmeriSciences' distributor network is a trade secret ................ 16

                  a.      AmeriSciences' distributor network was not known outside
                       of AmeriSciences ......................................................... 17

b. Access to AmeriSciences' distributor network was restricted and provided on an "as needed" basis ...........................17

c. AmeriSciences' distributor network was secured through confidentiality agreements and access limitations .........................18

d. AmeriSciences' distributor network was extremely valuable to AmeriSciences and to the Organo Defendants............18

e. AmeriSciences' distributor network is much more than general skills, knowledge, and experience ......................................19

2. The Organo Defendants obtained AmeriSciences' distributor network by improper means and with knowledge that the distributor list was a secret that Cocheu and Gallardo disclosed in breach of their fiduciary duties ................................................................20

a. The Organo Defendants improperly acquired the distributor network by encouraging Cocheu's and Gallardo's theft and breach of fiduciary duties.............................................................21

b. The Organo Defendants knew the distributor network was a trade secret and that the disclosure of the same by Cocheu and Gallardo was a breach of their fiduciary duties ....................22

3. The Organo Defendants used the distributor network without the consent of AmeriSciences...........................................................23

4. The Organo Defendants' acquisition of the distributor network caused AmeriSciences $3,451,166 in damages .........................25

D. The Evidence in The Record Supports a Finding that the Organo Defendants Converted the Distributor Network and Other AmeriSciences Assets (Count II) ....................................................................25

E. The Evidence in the Record Demonstrates that the Organo Defendants Tortuously Interfered with AmeriSciences and Its Contracts With its IMCs (Count III) ...........................................................................................27

F. The Evidence in the Record Establishes that the Organo Defendants Aided and Abetted Cocheu's and Gallardo's Breaches of Fiduciary Duties (Count V) ...................................................................................................29

G. The Evidence in the Record Supports a Finding that the Organo Defendants Were Unjustly Enriched Through Their Wrongful Acquisition of AmeriSciences Assets (Count VI)..................................................................30

H.     The Evidence in the Record Supports a Finding that the Organo Defendants Were the Transferees of the Fraudulent Transfer of AmeriSciences' Assets (Counts VII, VIII, IX, and X) ............................................32

     1.     The transfer of the AmeriSciences' distributor network and other assets to the Organo Defendants was done with actual fraudulent intent .............................................................................32

     2.     The transfer of AmeriSciences' distributor network and other assets to the Organo Defendants was constructively fraudulent...............34

VI.     CONCLUSION.....................................................................................................36

CERTIFICATE OF SERVICE ......................................................................................1

# INDEX OF AUTHORITIES

**Page**

## Cases

*360 Mortg. Grp., LLC v. HomeBridge Fin. Servs.*, 2016 U.S. Dist. LEXIS 25652
(W.D. Tex. Feb. 29, 2016) .................................................................................. 24

*Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242 (1986) .................................................. 13

*Austin v. Duval*, 735 S.W.2d 647 (Tex. App. 1987) ...................................................... 31

*Bandy v. First State Bank*, 835 S.W.2d 609 (Tex. 1992) ............................................... 25

*Black Lake Pipe Line Co. v. Union Constr. Co., Inc.*, 538 S.W.2d 80 (Tex. 1976) .................. 31

*Bohnsack v. Varco, L.P.*, 668 F.3d 262 (5th Cir. 2012) ................................................. 15

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................................... 13

*Corpus Christi v. S. S. Smith & Sons Masonry, Inc.*, 736 S.W.2d 247 (Tex. App.
1987) .......................................................................................................... 31

*Correa v. Houston Surgical Assistant Servs.*, No. 14-12-01050-CV, 2013 Tex.
App. LEXIS 9397 (Tex. Ct. App. July 30, 2013) ...................................................... 19

*Cox Tex. Newspapers, L.P. v. Wootten*, 59 S.W.3d 717 (Tex. App. 2001) ........................... 29

*Crocker Nat'l Bank v. Ideco Div. of Dresser Indus., Inc.*, 739 F. Supp. 338 (S.D.
Tex. 1990) .................................................................................................... 26

*Dunnagan v. Watson*, 204 S.W.3d 30 (Tex. App. 2006) ................................................ 29

*Evans v. Houston*, 246 F.3d 344 (5th Cir. 2001) ........................................................ 14

*Gearhart Indus., Inc. v. Smith Int'l, Inc.*, 741 F.2d 707 (5th Cir. 1984) ............................. 29

*Gen. Universal Sys. v. HAL, Inc.*, 500 F.3d 444 (5th Cir. 2007) ...................................... 23

*Ginzburg v. Mem'l Healthcare Sys.*, 993 F. Supp. 998 (S.D. Tex. 1997) ............................. 14

*GlobeRanger Corp. v. Software AG*, 27 F. Supp. 3d 723 (N.D. Tex. 2014) ......................... 22

*Grace v. Organo Gold Int'l, Inc.*, 14-03330 (Bankr. S.D. Tex. Nov. 4, 2014) ...................... 26

*Hayles v. GMC*, 82 F. Supp. 2d 650 (S.D. Tex. 1999) .................................................. 14

*Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39 (Tex. 1992) ....................... 31

*Honore v. Douglas*, 833 F.2d 565 (5th Cir. 1987) ....................................................... 14

*Hunke v. Wilcox*, 815 S.W.2d 855 (Tex. Ct. App. 1991) ............................................... 19

*Imperial Grp. (Texas), Inc. v. Scholnick*, 709 S.W.2d 358 (Tex. App. 1986) ....................... 29

*In re Air Crash at Dallas/Fort Worth Airport*, 1987 U.S. Dist. LEXIS 16039
(N.D. Tex. Nov. 5, 1987) ........................................................................... 24

*In re Bass*, 113 S.W.3d 736 (Tex. 2003) ................................................... 16

*Int'l Airport Ctrs., LLC v. Citrin*, 440 F.3d 418 (7th Cir. 2006) ................ 24

*Kesler v. King*, 29 F. Supp. 2d 356 (S.D. Tex. 1998) ................................ 13

*Lear Siegler, Inc. v. Ark-Ell Springs, Inc.*, 569 F.2d 286 (5th Cir. 1978) ................... 16

*Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994) ........................... 14

*Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634 (5th Cir. 2007) ............ 29

*Metallurgical Indus. Inc. v. Fourtek, Inc.*, 790 F.2d 1195 (5th Cir. 1986) ........... 20, 24

*Neways Inc. v. Mower*, 543 F. Supp. 2d 1277 (D. Utah 2008) ................... 20

*Providence Metallizing Co. v. Tristar Prods.*, 717 F. Supp. 2d 227 (D.R.I. 2010) ........ 24

*Quartemont v. St. Joseph Hosp. & Health Ctr.*, No. H-94-1787, 1995 U.S. Dist.
LEXIS 14160 (S.D. Tex. Aug. 14, 1995) ................................................... 14

*Rimkus Consulting Grp. v. Budinger*, No. 14-98-01101-CV, 2001 Tex. App.
LEXIS 5860 (Tex. Ct. App. Aug. 23, 2001) .............................................. 19

*Samsung Elecs. Am., Inc. v. Chung*, No. 3:15-CV-4108-D, 2017 U.S. Dist. LEXIS
21700 (N.D. Tex. Feb. 16, 2017) ............................................................... 29

*Seismograph Serv. Corp. v. Offshore Raydist, Inc.*, 135 F. Supp. 342 (E.D. La.
1955) ......................................................................................................... 21

*Semtech International, Inc. v. Drapeau*, No. 1:16-cv-918-RP, 2016 U.S. Dist.
LEXIS 178591 (W.D. Tex. Dec. 27, 2016) ................................................ 25

*Settlement Capital Corp. v. Pagan*, 649 F. Supp. 2d 545 (N.D. Tex. 2009) ......... 26, 27

*Southwestern Bell Tel. Co. v. John Carlo Texas, Inc.*, 843 S.W.2d 470 (Tex. 1992) ......... 27

*Soza v. Hill* (*In re Soza*), 542 F.3d 1060 (5th Cir. 2008) ........................... 33

*TIG Ins. Co. v. James*, 276 F.3d 754 (5th Cir. 2002) ................................ 13

*Titan Global LLC v. Organo Gold Int'l, Inc.*, No. 12-CV-2104-LHK, 2012 U.S.
Dist. LEXIS 171484 (N.D. Cal. Dec. 2, 2012) .......................................... 20

*Trilogy Software, Inc. v. Callidus Software, Inc.*, 143 S.W.3d 452 (Tex. App.
2004) .................................................................................................... 15, 19

*Twister B.V. v. Newton Research Partners, LP, 364 S.W.3d 428 (Tex. App. 2012)* ...... 16, 22

*Ultraflo Corp. v. Pelican Tank Parts, Inc.*, 926 F. Supp. 2d 935 (S.D. Tex. 2013) ...... 16, 20

*West v. Seiffert (In re Houston Drywall, Inc.)*, No. 06-03415, 2008 Bankr. LEXIS
    4060 (Bankr. S.D. Tex. July 10, 2008) ..................................................................... 33

**<u>Statutes</u>**

11 U.S.C. § 101(32) ............................................................................................................ 34

11 U.S.C. § 544 ................................................................................................................... 35

11 U.S.C. § 548(a)(1)(A) ............................................................................................. 32, 33

11 U.S.C. § 548(a)(1)(B)(i)–(ii)(I) .................................................................................... 34

11 U.S.C. § Section 550(a) ................................................................................................. 32

17 U.S.C. § 201(d) .............................................................................................................. 26

Tex. Bus. & Com. Code § 24.003 ...................................................................................... 33

Tex. Bus. & Com. Code § 24.005(a)(1) ............................................................................. 32

Tex. Bus. & Com. Code § 24.005(a)(2)(A) ....................................................................... 34

Tex. Bus. & Com. Code § 24.005(b) .................................................................................. 33

Tex. Bus. & Com. Code § 24.006(a) .................................................................................. 34

**<u>Other Authorities</u>**

Fed. R. Bankr. P. 3001 ........................................................................................................ 34

Fed. R. Civ. P. 56(a) ........................................................................................................... 13

Fed. R. Civ. P. 56(c) ........................................................................................................... 13

**<u>Constitutional Provisions</u>**

Restatement (First) of Torts § 757 .......................................................................... 16, 21, 22

Restatement (Second) of Agency § 112 .............................................................................. 24

Restatement (Third) of Unfair Competition § 40 ............................................................... 24

Restatement (Third) of Unfair Competition § 40(b)(3) ................................................ 22, 23

Rodney D. Tow (the "Trustee") hereby files this Opposition to Motion for Summary Judgment (the "Motion"), ECF No. 51, of Defendants Organo Gold Int'l, Inc., Organo Gold Enterprises, Inc. (together with Organo Gold Int'l, Inc., "Organo Gold"), and Holton Buggs ("Buggs" and together with Organo Gold, the "Organo Defendants").

## I.    INTRODUCTION

The Organo Defendants move for summary judgment on claims[1] brought by the Trustee to remedy the harms caused to AmeriSciences, L.P. ("AmeriSciences") and its creditors. Through a wrongful and extensively-planned scheme, the Organo Defendants stole AmeriSciences' business methods, distributor network and information, and other valuable assets.   The Trustee has assembled numerous facts establishing each of the elements of the claims against the Organo Defendants.   The Trustee is prepared to put evidence on at trial proving each of the claims against the Organo Defendants.   Material facts are in dispute and summary judgment in favor of the Organo Defendants is not appropriate.   The Organo Defendants' Motion should therefore be denied.

## II.    NATURE AND STATE OF THE PROCEEDING

On October 4, 2012, certain creditors filed involuntary bankruptcy proceedings under Chapter 7 against AmeriSciences.   AmeriSciences did not formally respond to the involuntary petition; it did, however, consent to the requested relief pursuant to an agreed entry entered on November 27, 2012, which converted the case to one under Chapter 11 of the Bankruptcy Code. Thomas H. Grace (the "Original Trustee") was appointed as Chapter 11 Trustee over AmeriSciences and its estate.   The Original Trustee administered the case under Chapter 11 from

---

[1] As discussed herein, the Organo Defendants' Motion is unclear as to which specific counts they seek summary judgment upon.   Although they docket their Motion as a motion for "partial summary judgment," they appear to address each of the Trustee's claims at least briefly.   Accordingly, the Trustee addresses each of the nine claims against the Organo Defendants in this Response.

his appointment on December 5, 2012 through the reconversion of AmeriSciences' bankruptcy case to Chapter 7 on January 12, 2015.  Thereafter, the Original Trustee was appointed as the Chapter 7 Trustee of AmeriSciences' Estate and remained in that capacity through his retirement on January 20, 2017.  Upon the retirement of the Original Trustee, the Trustee was appointed as successor trustee.

While this case was pending as one under Chapter 11 of the Bankruptcy Court, the Original Trustee commenced the above-captioned litigation by filing a complaint in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), thereby initiating Adversary Proceeding Number 14-03330.  On March 11, 2017, this Court withdrew reference over the Adversary Proceeding from the Bankruptcy Court, and the case has continued under the jurisdiction of this Court.  This case, which is presently before the Court on the Organo Defendants' motion for summary judgment, includes the Trustee's assertion of nine separate causes of action against the Organo Defendants which appear to be the subject of the Organo Defendants' Motion.  Specifically, the Trustee's Complaint asserted causes of action against the Organo Defendants including: (1) misappropriation of trade secrets; (2) conversion; (3) tortious interference with contractual relationships; (4) aiding and abetting breaches of fiduciary duties; (5) unjust enrichment; and (6) four separate fraudulent transfer and avoidance claims.  The specific legal standard for supporting each of the causes of action is addressed below along with an analysis and application of the summary judgment standard.

## III.  STATEMENT OF ISSUES AND CONCISE SUMMARY

The Organo Defendants' Motion focuses on two main issues: (1) whether the Trustee sold the causes of action asserted in this action; and (2) whether the record contains evidence to support the Trustee's causes of action against the Organo Defendants.  In short, the Trustee's response to the Motion is as follows:

- This Court has already denied the Organo Defendants' arguments regarding the sale of the causes of action, and the evidence in the record supports that (1) the Buyer did not, nor did he intend to, purchase the causes of action; and (2) the Seller did not, nor did he intend to, sell the causes of action.

- The evidence in the record supports findings that the Organo Defendants, as themselves owners of a multi-level marketing business, received AmeriSciences' distributor network and other assets via improper means and without reasonably equivalent value, or *any* value to AmeriSciences.

- The evidence in the record further supports findings that although the Organo Defendants were aware of Barry Cocheu and Louis Gallardo's fiduciary duties to AmeriSciences and were aware of various contractual obligations and restrictions, they encouraged and assisted in the breaching of those duties and the breaching of the various contractual obligations and restrictions with AmeriSciences.

Because the record reflects significant facts in support of the Trustee's claims, and because those facts, when viewed in the light most favorable to the Trustee, support each of his claims against the Organo Defendants, the Motion should be denied.

## IV.   FACTS

### A.   AmeriSciences' Business Operations.

Between its inception as AmeriReach.com, LLC in 1999 and its ultimate demise in the Spring of 2012, AmeriSciences operated as a network marketing or multi-level marketing ("MLM") business whose primary products were nutritional supplements.  Redman Dep. 10:9–16, 11:15–20.[2]  As an MLM business, AmeriSciences' primary source of sales came through its network of independent distributors, who were known as "independent marketing consultants" (individually, an "IMC," collectively, the "IMCs").  Redman Dep. 26:23–27:3, 68:1–19.  IMCs purchased products from AmeriSciences for resale to their customers, as well as for their own personal use.  Redman Dep. 32:16–19; 38:9–12 (explaining distributors were also customers).

---

[2] Deposition of Steven L. Redman, Oct. 18, 2017.  A true and accurate copy of the transcript of the deposition, with exhibits, is attached hereto as **Exhibit 1**.

Thus, IMCs were themselves customers of AmeriSciences.  Montesinos Dep. 57:15–19, 63:18–24[3]; Skirm Dep. 174:16–18[4]; Redman Dep. 14:4–6.

As with most MLM businesses, AmeriSciences' sales volume grew as its network of IMCs grew in overall size and location.  *See* Skirm Dep. 150:22–151:1 (explaining the advantage of having a large volume of distributors); Redman Dep. 29:5–10 ("[I]f you have a larger network, then you have more customer sales as well.").  Simply stated, AmeriSciences' most valuable asset was its network of distributors.  Montesinos Dep. 166:14–19 (describing the "significant value" of the distributor list); Skirm Dep. 228:20–229:1 (same); Redman Dep. 258:1–4 (explaining his position that the distributor list and the downlines were "worth many millions of dollars").

Under the direction of Barry Cocheu ("Cocheu"), its president and CEO, Louis Gallardo ("Gallardo"), its chairman, and Steven Redman ("Redman"), its executive vice president, AmeriSciences built a network of distributors with significant investments of time, effort and money, with a resulting roster of approximately 6,700 distributors as of April 2012.  Cocheu Exam. 74:19–25[5] (acknowledging role as president and CEO of AmeriSciences); Redman Dep. 26:1–9 (identifying Cocheu as president, Gallardo as chairman, and Redman as executive vice president), Skirm Dep. 148:2–149:6.  AmeriSciences' distributor network and associated confidential and proprietary information (collectively, the "Distributor Network"), as it was ultimately received by the Organo Defendants, was the result of "years of work . . . to build a list

---

[3] Deposition of Carlos A. Montesinos, Sept. 13, 2017.  A true and accurate copy of the transcript of the deposition, with omitted exhibits, is attached to the Organo Defendants' Motion as Exhibit B.

[4] Deposition of George W. Skirm, Sept. 8, 2017.  A true and accurate copy of the transcript of the deposition, with certain exhibits, is attached to the Organo Defendants' Motion as Exhibit D.

[5] Examination of Barry D. Cocheu, Aug. 7–8, 2014.  A true and accurate copy of the transcript of the examination, with omitted exhibits, is attached hereto as **Exhibit 2**.

of people," Skirm Dep. 157:5–8, and millions of dollars.  Redman Dep. 136:14–19 (noting that

to build a distributor network from scratch "would have taken years and millions of dollars").

Buggs himself acknowledged the substantial investment of time and money that is necessary to

develop a network such as AmeriSciences' distributor network.  Buggs Dep. 88:2–8.[6]

### B.     AmeriSciences Placed Restrictions on IMCs from Using Its Distributor Network.

Upon joining AmeriSciences, each IMC would execute an Independent Marketing

Consultant Agreement (an "IMC Agreement") with AmeriSciences.  Redman Dep. 49:17–19.

Among other things, the IMC Agreements bound counterparties to AmeriSciences' Policies and

Procedures (the "P&Ps") and any amendments thereto.  Redman Dep. 49:5–16, 56:4–57:4,

60:14–19.  AmeriSciences always published the most recent version of the P&Ps on its website.

Skirm Dep. 17:23–24.

The IMC Agreement and the P&Ps explicitly prohibited IMCs from recruiting or

attempting to recruit any of AmeriSciences' other IMCs to join a different MLM business.

Redman Dep. 59:3–14.  This practice, also known as poaching or cross-sponsoring, is generally

considered to be unethical in the MLM industry at large.  Buggs Dep. 97:1–10; Redman Dep.

59:15–23.  The IMC Agreement in effect at the time of the Organo Defendants' wrongful actions

read as follows:

> IMCs shall not directly or indirectly solicit IMCs of [AmeriSciences]
> into other network marketing organizations during the term of this
> agreement.  This term will remain in effect for the period of the
> Agreement and for 1 year thereafter . . .

Redman Dep. 57:6–13, ex. 79 (IMC Agreement ¶ 10).

---

[6] Deposition of Holton Buggs, Jr., Sept. 12, 2017.  A true and accurate copy of the transcript of the deposition, with certain exhibits, is attached to the Organo Defendants' Motion as Exhibit C.

AmeriSciences' P&Ps prohibited IMCs from "sponsor[ing], or attempt[ing] to sponsor, another COMPANY IMC or licensee into any other network marketing company" during the term of the IMC Agreement, which was a period of one year.  Redman Dep. 61:9–22, 62:16–63, ex. 80 (P&Ps § 3.06).  The P&Ps also contained a Confidentiality Agreement that obligated each IMC of AmeriSciences to maintain the confidentiality of the AmeriSciences' distributor list, its downline, and its genealogy reports.  They also expressly provided that the foregoing items were "proprietary and confidential" information of AmeriSciences.  Redman Dep. 64:7–65.4, ex. 80 (P&Ps § 6.01).

### C.     AmeriSciences' Measures to Safeguard Its Distributor Network.

AmeriSciences took many steps to safeguard and shield its valuable trade secrets from general public access.  Skirm Dep. 128:7–11.  For example, the full array of distributor information, which contained, in part, user names, user IDs and passwords, phone numbers, email addresses, tax IDs, Social Security numbers, companies associated with individuals, enrollment numbers, and positions within AmeriSciences' distribution network, was treated as a "very confidential list."  Skirm Dep. 59:22–60:5, 60:13–20; Skirm Dep. 60:6; Redman Dep. 186:11–14 (deeming the distributor list "proprietary").  Access to AmeriSciences' complete distributor list was limited to Redman and AmeriSciences' IT team, including its Director of IT, and later CIO/CTO, George Skirm ("Skirm").

IMCs were granted access to their own downline genealogies through a password-protected web system.  Skirm Dep. 19:20–24, 20:9–14.  IMCs were restricted from accessing their upline genealogies and the downline genealogies of other IMCs.  Skirm Dep. 10:21–25, 13:9–15, 19:20–24, 22:15–23:8, 30:6–9, 35:20–36:2, 39:1-6, 128:12–14.

Outside of the IMCs themselves, information regarding AmeriSciences' distributor list was limited to those on a need to know basis.  Skirm Dep. 35:13–16.  For instance, "a warehouse

employee . . . didn't have access to the customer side of the database.  They only had rights to the orders and shipment side of the business."  Skirm Dep. 24:2–14.  The only AmeriSciences employees that could look at upside genealogies were customer service employees, the IT department, and senior management.  Skirm Dep. 25:16–20.  Even though customer service representatives had significant access, several measures were in place to restrict their access and actions, such as limiting access to passwords and eliminating the ability for a representative to modify a distributor's network level.  *See* Skirm Dep. 105:3–106:3.

The measures taken by AmeriSciences were on par with other multi-level marketing firms.  *See* Skirm Dep. 223:8–224:3; Buggs Dep. 87:8–9 (stating most distributors have access to their downline network).

### D.    AmeriSciences Becomes Insolvent.

Although AmeriSciences "always had substantial income coming in," it had significant liabilities and continued to operate with regular cash flow issues towards the end of its operations.  Cocheu testified in 2012 that prior to the transfers to the Organo Gold Defendants, AmeriSciences was unable to pay its vendors in full when obligations became due.  Cocheu Exam. 253:3–25 (explaining that AmeriSciences was cash flow insolvent and unable to pay obligations when they came due).  Similarly, AmeriSciences' balance sheets reflected insolvency for several years through and including April 2012.  Redman Dep., ex. 81–84.

### E.    Organo Gold's Business Operations.

Like AmeriSciences, Organo Gold is a MLM business; however, Organo Gold sells coffee products rather than nutritional products.  Skirm Dep. 221:2–6.  Buggs was an executive vice president of sales for Organo Gold, Buggs Exam. 25:13–22,[7] and received compensation

---

[7] Examination of Holton Buggs, Jr., Sept. 10, 2014.  A true and accurate copy of the transcript of the examination, with exhibits, is attached hereto as **Exhibit 3**.

from Organo Gold based upon the percentage of sales for all of Organo Gold.  Buggs Dep. 42:11–43:13.  As with any other MLM, Organo Gold desired continued growth of its distributor base to increase the amount of overall sales—sales that support Buggs' lavish lifestyle, which includes his ability to drive (among other things) a Rolls Royce.  Buggs Dep. 71:18–21.

### F.   Buggs, Cocheu, and Gallardo Initially Discuss Organo Gold Acquiring AmeriSciences' Assets.

Cocheu and Gallardo met with Buggs in the Fall of 2011 to obtain advice on increasing AmeriSciences' sales and profitability.  Buggs Exam. 57:21–59:6 (providing advice to Cocheu and Gallardo regarding recognition programs and compensation plans).  Cocheu and Gallardo were enamored with Buggs' flashy life-style and apparent success, and considered selling coffee products similar to those of Organo Gold, joining Organo Gold as distributors, or selling AmeriSciences to Organo Gold.  Montesinos Dep. 81:18–82:7; Cocheu Exam. 200:1–203:10 (explaining considerations).  In furtherance of their proposed sale, Cocheu and Gallardo asked members of AmeriSciences' team to put together information regarding AmeriSciences' assets. *See, e.g.*, Montesinos Dep. 114:11–13.  Cocheu, Gallardo, and others at AmeriSciences believed the Organo Defendants were interested in AmeriSciences' large base of "high value, high dollar, highly successful" distributors.  Redman Dep. 148:8–14; Montesinos Dep. 46:24–47:5.  The Organo Defendants, however, were never interested in an above-board purchase of AmeriSciences or its assets.  Buggs Dep. 49:4–9; Buggs Exam. 73:6–12.

By early January 2012, the Organo Defendants furthered their efforts to recruit Cocheu, Gallardo, and all of AmeriSciences' IMCs by inviting Cocheu and his wife to attend a large Organo Gold conference in Las Vegas as "VIP guests" of, and with expenses paid by, the Organo Defendants.  Buggs Exam. 61:18–62:7.  During the conference Cocheu met with Buggs

and several other high level Organo Gold executives, including Bernardo Chua, Organo Gold's founder and senior executive. Buggs Exam. 64:17–65:2; Buggs Dep. 45:13–14.

Over the next few months following the conference, the Organo Defendants, through Buggs, furthered their wrongful plans to obtain AmeriSciences' distributor network over numerous telephone calls and meetings. Buggs Exam. 81:6–10. On January 12, 2012, Cocheu sent an email to Buggs and Gallardo to discuss "initial phases of preliminary requirements to set up a successful transition." Buggs Exam. 66:24–67:19. As Buggs understood it, that statement concerned Cocheu and Gallardo becoming Organo Gold distributors. Buggs Exam. 67:17–23, 70:17–18, ex. 3.

### G.   Buggs, Cocheu, and Gallardo Agree on the Terms of Organo Gold's Acquisition of AmeriSciences' Assets.

On April 3, 2012, Buggs emailed Cocheu the terms of the ultimate agreement by which the Organo Defendants would acquire AmeriSciences' most significant assets. Buggs Exam. 80:24–25:5, ex. 6; Perrett Dep. 25:4–13, ex. 6.[8] Pursuant to the email, the Organo Defendants, through Buggs, demanded that Cocheu and Gallardo, among other things, (1) "cease the promotion of . . . AmeriSciences and solely promote Organo Gold"; (2) "transfer the existing genealogy from AmeriSciences to Organo Gold"; and (3) "provide Organo Gold a current official sales report of its AmeriSciences." *Id.* In exchange for these demands, the Organo Defendants offered to pay Cocheu and Gallardo—not AmeriSciences—$50,000 per month for up to nine months, with the first payment to be made within five days after the transfer of the AmeriSciences' distributor network and the announcement from Cocheu and Gallardo to AmeriSciences' field-leadership team. *Id.*; Cocheu Exam. 206:2–24 (admitting AmeriSciences received no payment for the transfers). The Organo Defendants offered to seamlessly transfer

---

[8] Deposition of Norman G. Perrett, Sept. 20, 2017. A true and accurate copy of the transcript of the deposition, with exhibits, is attached hereto as **Exhibit 4**.

AmeriSciences' existing distributor network to Organo Gold at levels and ranks comparable to those at AmeriSciences.  Buggs Exam. 123:23–124:12.

Cocheu knew he was breaching his fiduciary duties.  Throughout his discussions with Buggs, Cocheu used his AmeriSciences email address; however, shortly prior to transferring AmeriSciences' assets to Organo Gold, Cocheu requested that Buggs communicate with him through his personal, Gmail address.  Buggs Exam. 95:12–96:1, ex. 8.  At all times during these negotiations, the Organo Defendants were acutely aware that Cocheu and Gallardo were fiduciaries of AmeriSciences.  Buggs Exam. 61:4–10 (acknowledging that he "understood Barry was CEO and Lou was president").

### H.    Organo Gold's Improper Acquisition of AmeriSciences' Assets.

With the help of the Organo Defendants, Cocheu and Gallardo terminated AmeriSciences' business operations and transferred its assets to Organo Gold without any compensation to AmeriSciences.  Redman Dep. 150:7–17 ("Lou and Barry got a check and everyone else got the liabilities.").

On April 10, 2012, Cocheu and Gallardo publicly announced their move to Organo Gold in a meeting attended by Buggs and, among others, Greg and Monica Nakagawa (Inspiramed LLC), Steve and Jeanne Fertig (HealthTech Direct, LLC), Jeff and Lisa Giammalva, (Global Wellness Group), Kent and Donna Wascovich (Wellness Ventures, LLC), Grant and Lynn Sperry, and William and Marie Krooss (collectively, the "Distributor Defendants").[9]  Buggs Exam. 97:5–98:3.  During that meeting, and in numerous subsequent telephone calls, many of which Buggs was a participant, Perrett Dep. 24:15–25, Cocheu and Gallardo encouraged AmeriSciences' IMCs to transition to Organo Gold.  Buggs Exam. 102:12–105:4.

---

[9]  The Distributor Defendants, together with Gallardo, CSF Legacy, LP, BLS Management, LP, and LBS Real Properties, LP, were all defendants in this litigation; however, they each reached agreement with the Trustee and were dismissed as Defendants on April 28, 2016.

To seamlessly transition AmeriSciences' IMCs, Cocheu demanded that Skirm prepare a master distributor list containing the names, home and business addresses, business and cellular telephone numbers, e-mail addresses, tax identification numbers, usernames and passwords, and the status and rank of AmeriSciences' IMCs.  Skirm Dep. 64:4–6.  Skirm was asked to make edits to IMCs' existing downlines; notably, to remove inactive distributors and to reorganize their genealogies to more seamlessly interface with Organo Gold's existing distributor network. Skirm Dep. 87:25–88:10 (noting several distributors asked him to "get rid of the dead weight so when it was converted over into Organo, the earning potential was stronger"), 92:18–22 (noting a distributor wanted certain individuals set at specific ranks in the compensation plan prior to moving the distributor list to Organo Gold).  Prior to sending the distributor list to Organo Gold, Skirm used a conversion algorithm to convert IMCs from AmeriSciences' unilevel plan to a binary plan comparable to Organo Gold's distributor network.  Skirm Dep. 86:14–19, 87:19–24.

Recognizing the proprietary nature of the distributor list and his obligations to AmeriSciences, Skirm was unwilling to send the distributor list directly to the Organo Defendants as requested by Cocheu.  Skirm Dep. 65:10–11.  Skirm nevertheless complied with Cocheu's orders by creating a master distributor list and sending it directly to Cocheu.  Skirm Dep. 59:6–19, 65:14–17, 213:18–23.  Cocheu then delivered the distributor list, the embodiment of AmeriSciences' most valuable asset, to the Organo Defendants on April 19, 2012.  Perrett Dep. 19:21–20:2, ex. 30; Buggs Dep. 99:16–20 (admitting receipt of the distributor list).

By transferring the distributor list to the Organo Defendants in this format, Cocheu ensured that the "information could be imported directly into [the] Organo Gold system," and that AmeriSciences' "distributors were basically already set up" as Organo Gold distributors.

Skirm Dep. 73:15–25.  In other words, the purpose of sending the distributor list was to "take all the IMCs from AmeriSciences and roll them into Organo Gold."  Skirm Dep. 83:9–10.

In the course of the illicit transfer of AmeriSciences' distributor network, the Organo Defendants also acquired proprietary software from AmeriSciences without making any payments.  The Organo Defendants acquired the Warehouse Management System ("WMS") program through an executed licensing agreement.  Skirm Dep. 121:13–15, 124:24–125:5; 195:5–17.  While Skirm, who developed the WMS program, estimated the value at more than $100,000, the Organo Defendants offered only $10,000.  Skirm Dep. 125:16–127:3, 199:11–16.

### I.      The Organo Defendants, Cocheu, and Gallardo Benefitted at AmeriSciences' Expense.

While AmeriSciences languished and ultimately died, Cocheu, Gallardo, and the Organo Defendants each benefitted from this unlawful transaction.  Cocheu and Gallardo were employed by Organo Gold as consultants, receiving between $300,000 and $450,000.  Buggs Exam. 89:11–90:16.  The Organo Defendants instantly acquired a large number of downline distributors—including many highly active distributors—without having to expend the cost, time, and effort normally required to obtain a large number of distributors.  Montesinos Dep. 69:5–8; Buggs Dep. 70:23–71:4.  *See also* Weingust Aff. ¶ 20[10] (valuing AmeriSciences' distributor network at $3,451,166 at the time it was wrongfully transferred to the Organo Defendants).

AmeriSciences and its employees and creditors, however, suffered.  Redman Dep. 150:7–17 ("Lou and Barry got a check and everyone else got the liabilities.").  In May 2012—after Cocheu and Gallardo, with the assistance of the Organo Defendants, stripped AmeriSciences of its most valuable assets—AmeriSciences closed its doors and ceased operations.  On October 4,

---

[10] Affidavit of Scott Weingust, Oct. 20, 2017.  The affidavit was attached as Exhibit A to the Trustee's Response to Organo Gold's Motion to Exclude Expert Testimony, ECF No. 58.  A true and accurate copy of the affidavit is attached hereto as **Exhibit 5**.

2012, several creditors of AmeriSciences commenced an involuntary bankruptcy proceeding against it. Chapter 7 Involuntary Petition, *In re AmeriSciences, L.P.*, No. 12-37545 (Bankr. S.D. Tex. Oct. 4, 2012), ECF No. 1. Over $8 million in claims have been filed against AmeriSciences' bankruptcy estate, many of which include unpaid balances that were in existence well before the Organo Defendants' wrongful acquisition of the AmeriSciences' distributor network and other assets. Claims Register, *AmeriSciences*, No. 12-37545 (Bankr. S.D. Tex. Oct. 4, 2012).

## V.  LAW AND ARGUMENT

### A.  Standard of Review.

Summary judgment is granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Facts are considered "material" if they "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 248 (1986). "A dispute about a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *TIG Ins. Co. v. James*, 276 F.3d 754, 759 (5th Cir. 2002). "If the evidence is such that a reasonable fact-finder could find in favor of the nonmoving party, summary judgment should not be granted." *Kesler v. King*, 29 F. Supp. 2d 356, 366 (S.D. Tex. 1998).

The movant bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56(c). A defendant moving for summary judgment "must affirmatively offer evidence that undermines one or more of the essential elements of the plaintiff's case, or must demonstrate that the evidence in the summary judgment record falls short of establishing an essential element

of the plaintiff's case." *Hayles v. GMC*, 82 F. Supp. 2d 650, 654 (S.D. Tex. 1999).  If the movant "fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

If the movant meets its initial burden, the nonmovant must "come forward with specific facts showing that there is a *genuine issue for trial.*"  *Ginzburg v. Mem'l Healthcare Sys.*, 993 F. Supp. 998, 1008 (S.D. Tex. 1997) (alteration in original) (citations omitted).  If the nonmovant "submit[s] evidence of contradictory facts," the court "must resolve factual controversies in favor of the nonmoving party." *Quartemont v. St. Joseph Hosp. & Health Ctr.*, No. H-94-1787, 1995 U.S. Dist. LEXIS 14160, at *7 (S.D. Tex. Aug. 14, 1995) (citing *Little*, 37 F.3d at 1075).

When considering the evidence, "[d]oubts are to be resolved in favor of the nonmoving party, and any reasonable inferences are to be drawn in favor of that party." *Evans v. Houston*, 246 F.3d 344, 348 (5th Cir. 2001).  The court should not "weigh evidence, assess credibility, or determine the most reasonable inference to be drawn from the evidence." *Honore v. Douglas*, 833 F.2d 565, 567 (5th Cir. 1987).

### B.     The Estate of AmeriSciences Owns the Causes of Action Asserted in this Case.

The Organo Defendants' argument regarding the alleged sale of the causes of action in this case have already been fully briefed and rejected by the Court.  *See* Organo Gold Defendants and Holton Buggs' Motion to Dismiss, and Alternatively for Summary Judgment on Standing and Brief in Support, ECF No. 17; Thomas H. Grace, Chapter 7 Trustee's Response in Opposition to Motion to Dismiss and Alternatively Motion for Summary Judgment filed by Organo Gold Defendants and Holton Buggs, ECF No. 18 (the "MTD Opposition"); and Order Denying Organo Gold Defendants and Holton Buggs' Motion to Dismiss for Lack of Standing, ECF No. 25 (the "Denial Order").  Accordingly, in the interests of judicial economy, the Trustee

incorporates his arguments and evidence set forth in the MTD Opposition and the Denial Order as if fully restated herein.

Further, since the briefing, Carlos Montesinos, Manager of Premium Vitamins and Supplements LLC d/b/a Nugevity (the "Buyer"), Montesinos Dep. 11:3–5, has specifically testified in his deposition that he did not purchase, nor did he ever intend to purchase, the causes of action asserted in this litigation. Montesinos Dep. 154:19–155:1, 172:11–173:1, 205:4–16, 206:21–207:6 ("[Y]ou're asking me the same question in 20 different forms, but the answer is the same. As I understand it, my understanding with the agreement, with the trustee, verbally or otherwise, was that he was going to retain the right to sue if there was any wrongs to be righted, to recoup monies for the creditors."). Similarly, the Original Trustee has testified that he did not sell, nor did he ever intend to sell the causes of action asserted in this litigation. Grace Dep. 58:20-59:23.[11] Accordingly, the record establishes that the Trustee did not sell the causes of action to the Buyer, and as such, the Organo Defendants are not entitled to summary judgment on this defense.

### C. The Evidence in the Record Supports the Trustee's Claims that the Organo Defendants Misappropriated AmeriSciences Trade Secrets (Count I).

AmeriSciences' distributor network is a trade secret and it was misappropriated by the Organo Defendants. A claim for misappropriation of a trade secret requires a plaintiff to show "(1) existence of a trade secret; (2) breach of a confidential relationship or improper discovery of a trade secret; (3) use of the trade secret; and (4) damages." *Bohnsack v. Varco, L.P.*, 668 F.3d 262, 279 (5th Cir. 2012) (quoting *Trilogy Software, Inc. v. Callidus Software, Inc.*, 143 S.W.3d 452, 463 (Tex. App. 2004)).

---

[11] Deposition of Thomas H. Grace, October 19, 2017. A true and accurate copy of the transcript of the deposition, with exhibits, is attached hereto as **Exhibit 6**.

### 1.   AmeriSciences' distributor network is a trade secret.

A trade secret is "any formula, pattern, device, or compilation of information that is used in one's business and presents an advantage over competitors who do not know or use it." *In re Bass*, 113 S.W.3d 736, 739 (Tex. 2003). The question of whether certain information constitutes a trade secret is an "elusive and difficult concept[]" that "ordinarily is best 'resolved by a fact finder after full presentation of the evidence from each side.'" *Id.* at 958 (quoting *Lear Siegler, Inc. v. Ark-Ell Springs, Inc.*, 569 F.2d 286, 288–89 (5th Cir. 1978)).

The subject matter of a trade secret must remain secret. Restatement (First) of Torts § 757 cmt. b (Am. Law. Inst. 1939).[12]  An entity may, however, communicate its trade secret to employees and "others pledged to secrecy" without losing trade secret protection. *Id.*  The level of secrecy required is such that "except by the use of improper means, there would be difficulty in acquiring the information." *Id.*  Texas courts examine six factors when determining whether a trade secret exists:

> (1) the extent to which information is known outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of the measures taken to guard the secrecy of the information; (4) the value of the information to the business and to its competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Ultraflo Corp. v. Pelican Tank Parts, Inc.*, 926 F. Supp. 2d 935, 958–59 (S.D. Tex. 2013) (citing *In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003)). All six factors need not be satisfied, and Courts may consider other circumstances to their analysis as appropriate. *Id.* at 959 (citation omitted). Applying the foregoing factors to the facts of this case leads to one conclusion – AmeriSciences' distributor network is a trade secret.

---

[12] "Texas courts generally follow the principles of the original Restatement of Torts section 757." *Twister B.V. v. Newton Research Partners, LP*, 364 S.W.3d 428, 439 (Tex. App. 2012).

**a.    AmeriSciences' distributor network was not known outside of AmeriSciences.**

AmeriSciences' distributor network, which contained sensitive information, such as contact information, passwords, tax identification numbers, Social Security numbers, and enrollment numbers of AmeriSciences' IMCs, was treated as "very confidential."  Skirm Dep. 59:22–60:6, 60:13–20.  AmeriSciences, recognizing the value of the information, shielded its distributor list from the general public and from other multi-marketing firms.  Skirm Dep. 128:7–11, 130:18–131:5.  The efforts used to protect this information were similar to those used in the MLM industry as a whole.  *See* Skirm Dep. 223:8–224:3; Buggs Dep. 87:8–9.

**b.    Access to AmeriSciences' distributor network was restricted and provided on an "as needed" basis.**

Employees and distributors were given access to the distributor list based on the principle that "only people that needed access to the data had access to the data."  Skirm Dep. 35:13–16.  Specifically, AmeriSciences' IMCs only had access to their order and commission history, their *downline* genealogy, and "various different things that you would expect to see if you were managing a multilevel marketing business."  Skirm Dep. 19:20–20:20.  AmeriSciences explicitly restricted distributors from accessing *upline* genealogies, or genealogies outside of the IMC's own network.  Skirm Dep. 22:15–23:8, 39:1–6, 128:12–14.  The Organo Defendants treated their own distributor list as a trade secret,[13] and Buggs himself acknowledged that it is typical for distributors in a MLM business to have access to their own downline genealogies.  *See* Buggs Dep. 87:8–9.

---

[13]  Attached hereto as **Exhibit 7** is a copy of a complaint filed by International for alleged breach of contract, tortious interference with economic relations, tortious interference with contractual relations, violation of the uniform trade secrets act, and injunctive relief (the "Organo Complaint") in which, among other things, International alleges that its "extensive list (also known as a downline list or 'geneology' of its Distributors" is a trade secret.

Employee access to the Distributor Network was similarly restricted.  Access was granted only as necessary to fulfill the employee's specific job function.  Skirm 35:13–16.  For instance, the information warehouse employees had access to was limited to orders and shipment information; customer service employees could view an IMC's upline information, but their ability to view passwords and manipulate data was restricted.  Skirm Dep. 24:2–14.

c.    **AmeriSciences' distributor network was secured through confidentiality agreements and access limitations.**

As described above, AmeriSciences used a combination of restrictions and confidentiality agreements to secure the Distributor Network and restrict its dissemination.  The P&Ps contained an express Confidentiality Agreement, wherein each IMC affirmatively agreed that the AmeriSciences' distributor network was a proprietary trade secret, and that confidentiality would be maintained.  Redman Dep. ex. 80 (P&Ps § 6.01).  AmeriSciences furthered this contractual limitation by restricting digital access to its distributor network by requiring a username and password to access AmeriSciences' Portal, which was protected with SSL encryption.  Skirm Dep. 20:9–14, 35:5–9.  Access to AmeriSciences' complete distributor network was accessible only through Redman or Skirm's IT team.  Skirm Dep. 30:6–9.

d.    **AmeriSciences' distributor network was extremely valuable to AmeriSciences and to the Organo Defendants.**

AmeriSciences unquestionably recognized the importance of its distributor network to its business.  *See, e.g.*, Montesinos Dep. 166:14–19 (stating the Distributor Network had "significant value"); Skirm Dep. 228:20–229:1 (stating AmeriSciences' business was "the list of distributors and the product"), 231:9–12 ("[T]here is value in a list of people that are willing to participate in a MLM business.  Of that, I could—I will defend, you know, I'll defend to my dying breath.  That is value.").  The Organo Defendants' receipt of "6700 names of people that are open to the MLM concept" was a significant benefit conferred on Defendants.  Skirm Dep.

18

148:2–149:6.  "[W]hile there may not have been an order or an account receivable or anything like that, there is an advantage by having that volume—and volume is the term that we use in the industry—having that volume transferred over."  Skirm Dep. 150:22–151:1.  More simply, having a greater number of individuals willing to buy and sell their product provided the Organo Defendants with a significant benefit.

### e. AmeriSciences' distributor network is much more than general skills, knowledge, and experience.

Both AmeriSciences and the Organo Defendants recognize the significant investments required to create a network of distributors.  AmeriSciences' Distributor Network was the result of significant financial expenditures and "years of work".  Skirm Dep. 157:5–8.  Despite recognizing the significant time and energy required to build a distribution network, Buggs Dep. 88:2–8, the Organo Defendants attempt to argue that the distributor list is nothing more than "general skills, knowledge, and experience"  Citing *Hunke v. Wilcox*, 815 S.W.2d 855 (Tex. Ct. App. 1991), Defendants attempt to equate proprietary distributor networks with everyday professional contacts acquired during employment.

However, Texas courts have dismissed this very argument by providing protection to confidential customer lists.  *See, e.g.*, *Trilogy Software*, 143 S.W.3d at 466 ("[I]nformation that a firm compiles regarding its customers may enjoy trade secret status under Texas law." (citation omitted)); *Correa v. Houston Surgical Assistant Servs.*, No. 14-12-01050-CV, 2013 Tex. App. LEXIS 9397, at *20–21 (Tex. Ct. App. July 30, 2013) ("We . . . find *Hunke* wholly distinguishable.  Appellants were not introduced to key physicians in the community and told not to contact them.  Appellants were . . . entrusted with assistant surgeon/surgeon relationships along with compiled data to make the relationships more valuable."); *Rimkus Consulting Grp. v. Budinger*, No. 14-98-01101-CV, 2001 Tex. App. LEXIS 5860, at *10–11 (Tex. Ct. App. Aug.

23, 2001) ("The interest which [the plaintiff] [sought] to protect here, by contrast, is not contacts in the community [as in *Hunke*] but information of a proprietary nature, similar to a customer list.").

The evidence shows that AmeriSciences' distributor network is a trade secret under Texas law. This result is consistent not only with the application of Texas law, but the treatment of MLM distributor lists generally throughout the United States. *See, e.g.*, *Titan Global LLC v. Organo Gold Int'l, Inc.*, No. 12-CV-2104-LHK, 2012 U.S. Dist. LEXIS 171484, at *29–31 (N.D. Cal. Dec. 2, 2012) (treating customer and independent representatives lists as trade secrets); *Neways Inc. v. Mower*, 543 F. Supp. 2d 1277, 1290 (D. Utah 2008) (enjoining defendants from using trade secret information consisting of "downline reports, bonus recap reports or other similar types of [plaintiff's] distributor information").

> **2.      The Organo Defendants obtained AmeriSciences' distributor network by improper means and with knowledge that the distributor list was a secret that Cocheu and Gallardo disclosed in breach of their fiduciary duties.**

Using Michigan law, the Organo Defendants incorrectly argue that a confidential relationship must have existed between AmeriSciences and the Organo Defendants at the time the Distributor Network was misappropriated in order for the Trustee to prevail on his claims. While the breach of a confidential relationship is <u>one</u> basis for a finding of liability for misappropriation of a trade secret, Texas courts also impose liability on those who discover the secret by improper means and on others who benefit from the breach. *See Ultraflo Corp.*, 926 F. Supp. 2d at 958 (stating trade secret misappropriation requires that a trade secret be acquired through "a breach of a confidential relationship <u>or</u> discovered by improper means" (emphasis added)); *Metallurgical Indus. Inc. v. Fourtek, Inc.*, 790 F.2d 1195, 1205 (5th Cir. 1986) (noting the imposition of liability "not only on those who wrongfully misappropriate trade secrets by

breach of confidence but also, in certain situations, on others who might benefit from the breach"). The evidence in the record supports a finding that the Organo Defendants both acquired AmeriSciences' distributor network by improper means and benefitted from the Cocheu and Gallardo's breaches of their duties to AmeriSciences.

>   a.   **The Organo Defendants improperly acquired the distributor network by encouraging Cocheu's and Gallardo's theft and breach of fiduciary duties.**

One who discovers a trade secret by improper means is liable for misappropriation. While there is no comprehensive list of improper means by which to acquire a trade secret, *Seismograph Serv. Corp. v. Offshore Raydist, Inc.*, 135 F. Supp. 342, 354 (E.D. La. 1955) ("No single test can be applied in all cases where improper acquisition of business information is charged. The inventiveness of the devious mind staggers the imagination."), generally improper means are those which "fall below the generally accepted standards of commercial morality and reasonable conduct." Restatement (First) of Torts § 757 cmt. f.

The Organo Defendants knew that Cocheu and Gallardo were fiduciaries of AmeriSciences, and that they originally intended to *sell* AmeriSciences' assets. Buggs Exam. 61:4–10; Buggs Dep. 48:17–49:9. Despite this knowledge, the Organo Defendants, through Buggs, encouraged Cocheu and Gallardo to transfer AmeriSciences' distributor network and other assets of AmeriSciences without *any* payment to AmeriSciences. In fact, the Organo Defendants specifically demanded that Cocheu and Gallardo abandon AmeriSciences' business operations. Perrett Dep. ex. 6. As a result, the Organo Defendants obtained AmeriSciences' most valuable assets for free and at the expenses of AmeriSciences' own creditors.

> **b.   The Organo Defendants knew the distributor network was a trade secret and that the disclosure of the same by Cocheu and Gallardo was a breach of their fiduciary duties.**

Texas courts specifically address instances where a defendant does not "knowingly procure the third party to use improper means or to violate his duty otherwise" to obtain a trade secret.  Restatement (First) of Torts § 757 cmt. k.[14]  A defendant is liable when it uses another's trade secret without privilege where it "learned the secret from a third person with notice of the facts that it was a secret and that the third person discovered it by improper means or that the third person's disclosure of it was otherwise a breach of his duty to the other."  *Id.* § 757(c); Restatement (Third) of Unfair Competition § 40(b)(3) (Am. Law. Inst. 1995).  Frequently, the two facts are "mutually dependent[,] and notice of the one is also notice of the other."  *Id.*  Or more simply, the Organo Defendants are liable if they (1) had notice that the distributor network was a secret, and (2) had notice of the fact that Cocheu and Gallardo's disclosure of the distributor network was a breach of their duties to AmeriSciences.  *See* Restatement (First) of Torts § 757 cmt. m.

The Trustee does not need to show that the Organo Defendants knew the acquisition of the AmeriSciences' distributor network was in fact improper, but rather, that the Organo Defendants "should have known of the impropriety of its acquisition," meaning "a reasonable man would be put on inquiry and an inquiry pursued with reasonable intelligence and diligence would disclose the facts."  *GlobeRanger Corp. v. Software AG*, 27 F. Supp. 3d 723, 750 (N.D. Tex. 2014) (emphasis added) (quoting Restatement (First) of Torts § 757 cmt. *l*).  The notice required to trigger liability can be actual or constructive.  Restatement (First) of Torts § 757 cmt. *l*.  A defendant's knowledge of any precautions against disclosure and its familiarity with

---

[14] "Texas courts generally follow the principles of the original Restatement of Torts section 757."  *Twister B.V. v. Newton Research Partners, LP*, 364 S.W.3d 428, 439 (Tex. App. 2012).

industry customs and practices are facts relevant to establishing a defendant's actual or constructive knowledge.  Restatement (Third) of Unfair Competition § 40 cmt. d.

The Organo Defendants, seasoned players in the MLM industry, undeniably knew that a MLM business' distributor network was a trade secret, and that disclosure by a fiduciary for personal gain was a breach of his duties.  First, the Organo Defendants themselves have argued that their own distributor lists are trade secrets.[15]  Buggs plainly concedes that distributor networks take significant time and effort to build, and that the MLM industry as a whole takes action to protect and prevent disclosure of distributor lists.  *See* Buggs Dep. 87:8–9, 88:2–8. Second, the Organo Defendants also knew that Cocheu and Gallardo were each members of AmeriSciences' senior management, and as such, would owe fiduciary duties to AmeriSciences. *See* Buggs Exam. 61:4–10.  Third, and most significantly, the transaction between the Organo Defendants and Cocheu and Gallardo provided absolutely no compensation to AmeriSciences. Perrett Dep. 25:4–13, ex. 6; Cocheu Exam. 206:2–24 (admitting no compensation was paid to AmeriSciences as a result of the transfers).  Viewing the evidence in the light most favorable to the Trustee, a reasonable person, and more definitively, another MLM business, would have been on notice that Cocheu and Gallardo's disclosure of AmeriSciences' distributor network was a breach of their fiduciary duties.

### 3. The Organo Defendants used the distributor network without the consent of AmeriSciences.

"Use" is defined as "[a]ny exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant," which includes "soliciting customers through the use of information that is a trade secret."  *See Gen. Universal Sys. v. HAL, Inc.*, 500 F.3d 444, 450 n.4 (5th Cir. 2007) (interpreting Texas law) (quoting Restatement (Third) of

---

[15] *See* Organo Complaint at p. 12.

Unfair Competition § 40 cmt c); *360 Mortg. Grp., LLC v. HomeBridge Fin. Servs.*, 2016 U.S. Dist. LEXIS 25652, at *16 (W.D. Tex. Feb. 29, 2016) (stating "use" includes "soliciting customers from which the defendant seeks to profit" (citation omitted)). Texas courts employ the everyday meaning of the word "use." *See Metallurgical Indus.*, 790 F.2d at 1205.

The facts demonstrate that the AmeriSciences' distributor list had significant value, and the simple addition of IMCs open to the concept of selling Organo Gold's product provided a benefit to the Defendants. *See* Weingust Aff. ¶ 20 (valuing AmeriSciences' distributor network at $3,451,166 on the date it was misappropriated by the Organo Defendants); Montesinos Dep. 166:14–19 (explaining the value of AmeriSciences' distributor network); Skirm Dep. 231:9–12 (explaining the value of adding number of distributors). Buggs acknowledged receipt of the distributor list, and acknowledged that several IMCs were added to his downline at Organo Gold. Buggs Dep. 94:23–95:5, 99:16–20. Thus, the Organo Defendants "used" the distributor network.

The Organo Defendants' argument that Cocheu and Gallardo's improper consent somehow legitimized receipt of the distributor list by the Organo Defendants is nonsense. Cocheu and Gallardo breached fiduciary duties in disclosing the distributor list and that does not constitute consent on behalf of AmeriSciences to use the distributor network. *See Providence Metallizing Co. v. Tristar Prods.*, 717 F. Supp. 2d 227, 232 (D.R.I. 2010) ("An agent who breaches his fiduciary duty loses his authority to bind the principal."); *see also* Restatement (Second) of Agency § 112 (Am. Law Inst. 1958) ("Unless otherwise agreed, the authority of an agent terminates if, without knowledge of the principal, he acquires adverse interests or if he is otherwise guilty of a serious breach of loyalty to the principal."); *Int'l Airport Ctrs., LLC v. Citrin*, 440 F.3d 418, 421 (7th Cir. 2006) (finding that an employee who breaches his fiduciary duty of loyalty to his employer acts without authorization); *see also In re Air Crash at*

*Dallas/Fort Worth Airport*, 1987 U.S. Dist. LEXIS 16039, at *12 (N.D. Tex. Nov. 5, 1987) ("Texas law has adopted the tenants of the Restatement (Second) of Agency).").

The Organo Defendants' reliance on *Semtech International, Inc. v. Drapeau*, No. 1:16-cv-918-RP, 2016 U.S. Dist. LEXIS 178591 (W.D. Tex. Dec. 27, 2016) is misplaced.  Unlike in *Semtech*, where the information in question was open to the public, *Id.* at *34, AmeriSciences took great lengths to protect its distributor network, limiting access to both distributors and employees.  *See* Skirm Dep. 22:15–23:8, 35:13–16, 39:1–6, 128:12–14.  Furthermore, the *Semtech* plaintiff failed to produce any evidence that the defendant had access to the distributor list or that he used the list to contact employees.  2016 U.S. Dist. LEXIS 178591, at *34.  Here, there is no question that the Organo Defendants received AmeriSciences' distributor list.  *See* Buggs Dep. 99:16–20.  The Organo Defendants also acknowledge that approximately 200 of AmeriSciences' IMCs joined Organo Gold following receipt of the distributor list.

### 4. The Organo Defendants' acquisition of the distributor network caused AmeriSciences $3,451,166 in damages.

The Trustee's damages expert, Scott Weingust, has concluded that AmeriSciences was damaged in the amount of $3,451,166 by the unlawful and improper acts of the Organo Defendants.  *See* Weingust Aff. ¶ 20.

The evidence shows that the Organo Defendants' wrongful obtainment and use of AmeriSciences' trade secret caused AmeriSciences significant damages.  For the foregoing reasons, the Organo Defendants' Motion should be denied.

### D. The Organo Defendants Converted the Distributor Network and Other AmeriSciences Assets (Count II).

The Organo Defendants converted AmeriSciences' WMS program.  Conversion is the "wrongful exercise of dominion and control over another's property in denial of or inconsistent with his rights."  *Bandy v. First State Bank*, 835 S.W.2d 609, 622 (Tex. 1992).  To establish a

claim for conversion, a plaintiff must show "(1) the plaintiff owned or had possession of the property or entitlement to possession; (2) the defendant unlawfully and without authorization assumed and exercised control over the property to the exclusion of, or inconsistent with, the plaintiff's rights as an owner; (3) the plaintiff demanded return of the property; and (4) the defendant refused to return the property." *Settlement Capital Corp. v. Pagan*, 649 F. Supp. 2d 545, 558 (N.D. Tex. 2009).

AmeriSciences owned its distributor network and WMS, a program specifically designed for AmeriSciences by Skirm.  Skirm Dep. 115:4–116:19.  The Organo Defendants unlawfully assumed control over the distributor network and the WMS program when Cocheu and Gallardo, in violation of their breaches of fiduciary duties, delivered these valuable assets to the Organo Defendants without any compensation to AmeriSciences.  Cocheu Exam. 206:2–24 (admitting no compensation was paid to AmeriSciences as a result of the transfers).  The Trustee demanded the return of these assets upon filing a complaint on November 4, 2014.  Complaint, *Grace v. Organo Gold Int'l, Inc.*, 14-03330 (Bankr. S.D. Tex. Nov. 4, 2014), ECF No. 1.  *See Crocker Nat'l Bank v. Ideco Div. of Dresser Indus., Inc.*, 739 F. Supp. 338, 340 (S.D. Tex. 1990) (stating the conversion occurred when plaintiff filed his original complaint).  To date, AmeriSciences is not in possession of, and the Organo Defendants have yet to return to AmeriSciences' estate, the distributor network, the WMS program, or their value.

Organo Gold argues it never took possession of the WMS program because they (1) only sought to *license* the WMS program, and (2) they "could not get the software to work."  Neither argument is relevant.  It is well established that a software licensee has an ownership interest in property.  *See* 17 U.S.C. § 201(d).  Furthermore, whether or not Organo Gold was able to utilize the software does not change the fact that it took exclusive control and possession of the WMS

program.   The facts show that the Organo Defendants wrongfully exercised dominion and control over AmeriSciences' assets.   The Organo Defendants' Motion should be denied.

### E. The Organo Defendants Tortiously Interfered with AmeriSciences and Its Contracts With its IMCs (Count III).

The Organo Defendants tortiously interfered with AmeriSciences' distributor contracts. To recover under Texas law for tortious interference with a contract, the Trustee must show (1) that a contract subject to interference existed, (2) that the alleged act of interference was willful and intentional, (3) that the alleged act of interference proximately caused the plaintiff damages, and (4) that the actual damages occurred. *Settlement Capital Corp. v. Pagan*, 649 F. Supp. 2d 545, 565 (N.D. Tex. 2009).  "[I]ntentional interference does not require intent to injure, only that the actor desires to cause the consequences of his action, or that he believes that the consequences are substantially certain to result from it."  *Southwestern Bell Tel. Co. v. John Carlo Texas, Inc.*, 843 S.W.2d 470, 472 (Tex. 1992) (citations omitted).

AmeriSciences had over 6,700 IMCs documented in its distributor network, Skirm Dep. 148:2–149:6, each of which had executed an IMC Agreement.  Redman Dep. 49:17–19.  Thus, AmeriSciences had approximately 6,700 contracts subject to interference, each of which prohibited the poaching of AmeriSciences' IMCs and specifically included a one-year extension of those obligations even *after* termination of the IMC Agreements.  Redman Dep. ex. 80 (P&Ps § 3.06).  By virtue of their own MLM operations, the Organo Defendants understood that signing up distributors who were currently contracted as distributors with another MLM business was problematic.  *See* Buggs Dep. 97:8–98:5.  The Organo Defendants also knew that many MLM businesses contractually prohibit distributors from being distributors in two MLM businesses simultaneously.   Buggs Exam. 135:4–15 (explaining that in his experience most MLM businesses had such agreements).  Based on their experiences in the multi-level marketing

industry, the Organo Defendants were acutely aware of the IMCs' contractual restrictions and inability to transfer their downlines to Organo Gold.

Furthermore, the evidence supports a finding that the Organo Defendants' interference with AmeriSciences' contractual relationships was willful and intentional. The Organo Defendants did not have any interest in procuring the assets of AmeriSciences in an above-board transaction. *See* Buggs Dep. 48:25–49:6. Rather, the Organo Defendants were interested only in adding AmeriSciences' distributors to their downline genealogy by a quick and seamless transfer of AmeriSciences' distributor network. *See* Buggs Dep. 49:7–9. Instead of entering into a legitimate transaction with AmeriSciences, the Organo Defendants met with Cocheu and Gallardo privately to entice them to breach their fiduciary duties to AmeriSciences and to encourage the IMCs to join Organo Gold, in breach of their IMC Agreements. *See* Perrett Dep. ex 6.

The evidence shows that the Organo Defendants' actions proximately caused AmeriSciences' damages. At the urging of the Organo Defendants, *see* Perrett Dep. ex. 6, Cocheu, Gallardo, and Buggs met with high-ranking AmeriSciences distributors to encourage them to abandon AmeriSciences and their continuing obligations to AmeriSciences under the IMC Agreements. *See* Buggs Exam. 102:12–105:4; Perrett Dep. 24:15–25. These actions resulted in actual damages in the amount of $3,451,166. *See* Weingust Aff. ¶ 19.

The Organo Defendants justify their actions by claiming that AmeriSciences was unable to perform under the IMC Agreements and that Cocheu and Gallardo terminated the contracts. The evidence shows, however, that numerous IMCs were under the impression that AmeriSciences and Organo Gold were merging, and that the IMC Agreements were in effect. *See* Redman Dep. 180:19–181:19. The evidence shows that the Organo Defendants intentionally

interfered with AmeriSciences' distributor network, resulting in actual damages.  The Organo Defendants' Motion should be denied.

### F.   The Organo Defendants Aided and Abetted Cocheu and Gallardo's Breaches of Fiduciary Duties (Count V).

The Organo Defendants aided and abetted in Cocheu and Gallardo's breaches of fiduciary duties owed to AmeriSciences.  To establish a claim for knowing participation in a breach of fiduciary duties, the Trustee must show "(1) the existence of a fiduciary relationship; (2) that the third party knew of the fiduciary relationship; and (3) that the third party was aware that it was participating in the breach of that fiduciary relationship."  *Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 639 (5th Cir. 2007) (citing *Cox Tex. Newspapers, L.P. v. Wooten*, 59 S.W.3d 717, 721–22 (Tex. App. 2001)).

Cocheu was the CEO of AmeriSciences, and Gallardo was Chairman of AmeriSciences. Cocheu Exam. 74:19–25; Redman Dep. 26:1–9.  Both were substantial equity owners in AmeriSciences, and directors of AMSCI Management, Inc., AmeriSciences' general partner. *See* Redman Dep. 17:23–20:13.  Fiduciary duties are generally owed by partners in a limited partnership.  *See, e.g.*, *Dunnagan v. Watson*, 204 S.W.3d 30, 47 (Tex. App. 2006); *see also* Tex. Bus. Orgs. Code § 7.001 (2017).  The duty of loyalty "demands that there shall be no conflict between duty and self-interest," *Imperial Grp. (Texas), Inc. v. Scholnick*, 709 S.W.2d 358, 365 (Tex. App. 1986), and a common example of conduct implicating the duty of loyalty is self-dealing.  *See Gearhart Indus., Inc. v. Smith Int'l, Inc.*, 741 F.2d 707, 719 (5th Cir. 1984). Cocheu and Gallardo therefore held fiduciary duties to AmeriSciences.

The Organo Defendants knew of Cocheu and Gallardo's fiduciary duties to AmeriSciences.  *See, e.g.*, *Samsung Elecs. Am., Inc. v. Chung*, No. 3:15-CV-4108-D, 2017 U.S. Dist. LEXIS 21700, at *32 (N.D. Tex. Feb. 16, 2017) (explaining that a third party may have

knowledge of a fiduciary relationship based on his knowledge and experiences in an industry.); *see also* Buggs Exam  61:4–10 ("I understood Barry was CEO and Lou was president.").  The Organo Defendants, operator of a MLM business, were aware of the obligations and prohibitions standard in the industry.  Through their knowledge of Cocheu and Gallardo's positions with AmeriSciences, Buggs Exam. 61:4–10, the Organo Defendants had knowledge of the fiduciary obligations Cocheu and Gallardo owed to AmeriSciences.

For example, Buggs, presumably to avoid any such issue, asked for "full disclosure of its investor agreements between it's [sic] distributors, Master Distributors."  Buggs Exam. ex. 6.  Buggs requested this information because he "thought it would have been important to know if, you know, Barry—and Lou were becoming Organo Gold distributors."  Buggs Exam. 82:17– 83:25.  The agreements were neither received nor reviewed.  Buggs Exam. 134:14–17.  Despite recognizing the importance of the agreements, and acknowledging that, in his experience, every MLM business had such agreements, Buggs Exam. 135:4–15, Buggs instead chose to proceed forward with the theft of AmeriSciences' valuable assets.

With knowledge of these obligations, the Organo Defendants expressly *demanded* that Cocheu and Gallardo abandon their obligations to AmeriSciences and immediately offer those duties to Organo Gold.  *See* Perrett Dep. ex. 6.  The evidence shows that Cocheu and Gallardo owed fiduciary duties to AmeriSciences, that the Organo Defendants were aware of those duties, and that the Organo Defendants not only participated in, but demanded, the breach of those fiduciary duties.  The Organo Defendants' Motion should be denied.

### G.    The Organo Defendants Were Unjustly Enriched Through Their Wrongful Acquisition of AmeriSciences Assets (Count VI).

The Organo Defendants were unjustly enriched when it acquired AmeriSciences' distributor network and WMS software at no cost through its own wrongful actions.  An action

based on unjust enrichment occurs when one person obtains a benefit from another by "fraud, duress, or taking an undue advantage." *Austin v. Duval*, 735 S.W.2d 647, 649 (Tex. App. 1987); *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992).  To be entitled to restitution, a person must show "not only that there was an unjust enrichment, but also that the person sought to be charged had wrongfully secured a benefit or had passively received one which it would have been unconscionable to retain."  *Corpus Christi v. S. S. Smith & Sons Masonry, Inc.*, 736 S.W.2d 247, 250 (Tex. App. 1987).  Generally, unjust enrichment is available only when there is no express contract covering the services or materials furnished.  *Black Lake Pipe Line Co. v. Union Constr. Co., Inc.*, 538 S.W.2d 80, 86 (Tex. 1976).

The Organo Defendants sought the acquisition of AmeriSciences' distributor network and WMS program without negotiating an actual agreement with AmeriSciences.  Instead of paying the true value for AmeriSciences' assets, they focused on obtaining the assets directly from AmeriSciences' fiduciaries at a discounted price.   Cocheu Exam. 206:2–24 (admitting no compensation was paid to AmeriSciences as a result of the transfers).

The Organo Defendants' wrongful actions allowed them to receive this benefit.  The Organo Defendants acknowledge that Cocheu and Gallardo were fiduciaries to AmeriSciences. Buggs Exam 61:4–10.  In spite of this knowledge, the Organo Defendants assisted Cocheu and Gallardo in breaching their fiduciary duties, and received the distributor network and the WMS program without any payment to AmeriSciences.  *See* Buggs Exam 92:9–12 (describing payment directly to Cocheu and Gallardo), 108:8–109:5 (admitting receipt of distributor network via email).

The Organo Defendants were rewarded substantially for their wrongful actions. AmeriSciences' distributor network provided the Organo Defendants with immediate and

complete access to approximately 6,700 distributors who were willing to sell products in an MLM business.  Skirm Dep. 148:2–149:6.  At least 200 of AmeriSciences' IMCs began selling for Organo Gold.  Buggs Dep. 94:23–95:9.  The acquisition of "high value, high dollar, highly successful" distributors provided the Organo Defendants with increased sales opportunities.  *See* Montesinos Dep. 46:24–47:5.   By acquiring a distributor network valued at $3,451,166, Weingust Aff. ¶ 20, the Organo Defendants avoided significant investments of time, money, and effort.  The evidence demonstrates that the Organo Defendants were unjustly enriched at the expense of AmeriSciences.  Accordingly, the Organo Defendants' Motion should be denied.

### H.    The Organo Defendants Were the Transferees of the Fraudulent Transfer of AmeriSciences' Assets (Counts VII, VIII, IX, and X)

Both the Bankruptcy Code and the Texas Uniform Fraudulent Transfer Act ("UFTA") permit the Trustee to recover fraudulent transfers, including those made to hinder, delay, and defraud AmeriSciences' Estate, as well as for transfers made for less than reasonably equivalent value.  Section 550(a) of the Bankruptcy Code then permits the Trustee to recover any such avoidable transfer from any immediate or mediate transferee of such fraudulent transfer.

#### 1.    The transfer of the AmeriSciences' distributor network and other assets to the Organo Defendants was done with actual fraudulent intent.

Under 11 U.S.C. § 548(a)(1)(A), the Trustee can avoid any transfer made "with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred[] [or] indebted."  Similarly, under the UFTA, a transfer is fraudulent where the debtor made the transfer "with actual intent to hinder, delay, or defraud any creditor of the debtor."  Tex. Bus. & Com. Code § 24.005(a)(1) (2017).

Courts applying both the avoidance provisions of section 548(a)(1)(A) and UFTA look to the badges of fraud to determine whether actual intent to defraud existed at the time of a transfer. *See Soza v. Hill* (*In re Soza*), 542 F.3d 1060, 1066–67 (5th Cir. 2008). Even if only several indicia of fraud are apparent after consideration of the badges of fraud, actual fraud may be inferred. *See id.* at 1067. UFTA provides a list of eleven badges of fraud including:

> (1) The transfer or obligation was to an insider; (2) The debtor retained possession or control of the property transferred after the transfer; (3) The transfer or obligation was concealed; (4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) The transfer was of substantially all the debtor's assets; (6) The debtor absconded; (7) The debtor removed or concealed assets; (8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

*West v. Seiffert* (*In re Houston Drywall, Inc.*), No. 06-03415, 2008 Bankr. LEXIS 4060, at *60–61 (Bankr. S.D. Tex. July 10, 2008) (quoting Tex. Bus. & Com. Code § 24.005(b)).

Here, the evidence in the record supports a finding that several of the badges of fraud exist. Cocheu took efforts to conceal the transfer of AmeriSciences' distributor network to the Organo Defendants by instructing Buggs to correspond with him in a non-AmeriSciences' email address to avoid discovery of the terms of the illicit agreement. Buggs Exam. 95:12–96:1, ex. 8.

AmeriSciences' distributor network was the lifeblood of its business, and AmeriSciences was insolvent either at the time of the transfer, or immediately thereafter. *See* Redman Dep. ex. 81–84 (reflecting balance sheet insolvency); Cocheu Exam. 253:3–25 (explaining that AmeriSciences was cash flow insolvent and unable to pay obligations when they came due). *See also* Tex. Bus. & Com. Code § 24.003 (defining insolvency to be when the sum of the debtor's debts is greater than its assets, or when the debtor is not generally paying its debts as they

become due); 11 U.S.C. § 101(32) (defining insolvency to be where the sum of the debtor's liabilities exceeds its assets, exclusive of property that has been fraudulently transferred).

Furthermore, immediately after transferring AmeriSciences' assets, Cocheu and Gallardo closed AmeriSciences' operations and turned to Organo Gold's business efforts.

Additionally, AmeriSciences' claims register reflects more than $8 million in liabilities that were allegedly in existence upon entry of an order for relief against AmeriSciences.[16]

Most tellingly, the undisputed facts in the record establish that AmeriSciences itself received <u>nothing</u> in exchange for its most valuable assets—assets valued at over $3 million as of the time of the transfer.  Cocheu Exam. 206:2–24 (admitting AmeriSciences received no payment for the transfers); Weingust Aff. ¶ 20 (valuing AmeriSciences' distributor network at $3,451,166 at the time it was wrongfully transferred to the Organo Defendants).

The facts demonstrated that AmeriSciences' distributor network and other assets were transferred to Organo Gold with actual intent to hinder, delay or defraud creditors.

> **2.    The transfer of AmeriSciences' distributor network and other assets to the Organo Defendants was constructively fraudulent.**

The Trustee may also recover under a theory of constructive fraud under the Bankruptcy Code and UFTA.  Under 11 U.S.C. § 548(a)(1)(B)(i)–(ii)(I), the Trustee can avoid any transfer where the debtor "received less than a reasonably equivalent value in exchange for such transfer" and "was insolvent on the date that such transfer was made."  UFTA similarly deems transfers fraudulent where the debtor did not receive "reasonably equivalent value in exchange for the transaction" at the time where "the remaining assets of the debtor were unreasonably small in relation to the business" or where the debtor was insolvent.  Tex. Bus. & Com. Code §§ 24.005(a)(2)(A), 24.006(a).

---

[16] See Fed. R. Bankr. P. 3001 (providing for prima facie validity of properly filed claims).

While AmeriSciences' distributor network had a value of $3,451,166 at the time it was transferred to the Organo Defendants, Weingust Aff. ¶ 20, and the WMS program was valued at $100,000, Skirm Dep. 125:16–127:3, AmeriSciences received no consideration for the transfer. Cocheu Exam. 206:2–24 (admitting AmeriSciences received no payment for the transfers). Further, AmeriSciences was either insolvent at the time of the transfer, or rendered insolvent as a result.  The evidence shows that the transfers of AmeriSciences' distributor network and WMS program were constructively fraudulent and avoidable under either section 544 of the Bankruptcy Code or UFTA.  For these reasons, the Organo Defendants' Motion should be denied.

## VI.    <u>CONCLUSION</u>

Contrary to the Organo Defendants' assertion that the record lacks support, significant facts in the record support findings on each of the Trustee's claims against the Organo Defendants.  Accordingly, the Organo Defendants' Motion should be denied in its entirety.

Dated:  November 10, 2017

Respectfully submitted,

/s/ John J. Sparacino

| | |
|---|---|
| Steven R. Rech | John J. Sparacino |
| State Bar No. 16649200 | State Bar No. 18873700 |
| Federal ID No. 15801 | Federal ID No. 12551 |
| VORYS SATER SEYMOUR AND PEASE LLP | VORYS SATER SEYMOUR AND PEASE LLP |
| 700 Louisiana, Suite 4100 | 700 Louisiana, Suite 4100 |
| Houston, Texas 77002 | Houston, Texas 77002 |
| (713) 588-7000 | (713) 588-7000 |
| (713) 588-7050 (fax) | (713) 588-7050 (fax) |
| srech@vorys.com | jjsparacino@vorys.com |
| | |
| *Of Counsel* | *Attorney-in-Charge for Rodney D. Tow, Chapter 7 Trustee of AmeriSciences, L.P.* |

36

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 10th day of November, 2017, a copy of the foregoing was filed electronically through the Court's CM/ECF system, which will send notification of such filing to all parties indicated on the electronic filing receipt.

*/s/ Steven R. Rech*
Steven R. Rech

*Attorney for Rodney D. Tow, Chapter 7 Trustee of AmeriSciences, L.P.*