IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **RODNEY D. TOW,** Chapter 7 Trustee, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| Vs. | § | Civil Action No.: 4:16-cv-643 |
| | § | |
| **ORGANO GOLD INT'L, INC.,** *et al.*, | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFF'S REPLY TO TRUSTEE'S RESPONSE TO MOTION FOR FINAL SUMMARY JUDGMENT**

COME NOW, Defendants, **Organo Gold Int'l, Inc.**, **Organo Gold Enterprises, Inc.** and

**Holton Buggs**, by their attorneys, and reply to the response of Plaintiff, **Rodney D. Tow**, Chapter

7 Trustee, to their Motion for Final Summary Judgment, and respectfully show as follows:

## A. INTRODUCTION

The Trustee's narrative of foul play and fraud is overstated. As explained by Barry Cocheu,

[AmeriSciences wasn't] able to pay our vendors 100 percent of what was owed... I believed that there was a way to manage the assets… but we were not able to manage it into a viable business within network marketing.[1]

In 2012, (a) Debtor, AmeriSciences, L.P., transitioned from network marketing, (b) Debtor

engaged a work-out specialist, and (c) some distributors (network marketers) left Debtor for

Organo Gold after being told that Debtor would not pay commissions or provide product.[2]

Creditors pushed Debtor into an involuntary bankruptcy before Debtor could restructure.[3]

### *"Distributor List" Does Not Equal "Distributor Network"*

With the above predicate, the Trustee complains of the transfer of Debtor's "distributor

network" worth millions to Defendants by an e-mailed "distributor list." To get from an e-mailed

---

[1] Cocheu Exam 253:3-18.
[2] Montesinos Dep. 106-109:15; Cocheu Exam 220:19-221:2.
[3] Montesinos Dep. 101:9-102:10.

"distributor list" to the transfer of a "distributor network" worth millions, the Trustee argues that the "distributor list" is a trade-secret and then calls it a "distributor network."  But,

> A "distributor list" is a physical document which could be a trade secret, disclosed, used, converted, misappropriated, etc. (not under the facts of this case); and
>
> A "distributor network" is a group of entities or individuals contracted to retail a wholesaler's products.

Being a <u>sales force</u>, a "distributor network" cannot be a trade secret.  And, a "distributor list," an inanimate <u>physical document</u>, cannot sell products.  Once disclosed to the public, a "distributor list" no longer is a trade secret.  And, a "distributor network" cannot be transferred.

The Trustee transposes the words "distributor network" for "distributor list" and argues that all are "trade secrets." Artful argument aside, conversion, misappropriation and transfer of a "trade secret" never occurred, and a "distributor list" is not a "distributor network."

### *Trustee's Sold His Claims*

The Trustee cannot bring claims asserted by him as he sold the claims to a third-party.  The Trustee argues that the parties never intended the sale of "claims." Court order establishes the sale of claims.  On this basis alone, dismissal of all but Chapter 5 transfers claims is mandated by law.

### *No Evidence of an Avoidable Transfer*

And, once established that "distributor list" does not equal "distributor network," it becomes clear that no avoidable transfer ever occurred.  There is no diminishment of Debtor's estate; the Trustee sold Debtor's intangible property for book value and there is no transfer of software or other asset as is explained below.  Thus, the Chapter 5 claims must also be dismissed.

### B.  FACTS

Debtor's audited financial records establish all intangible property (inclusive of distributor lists, trade-secrets, etc.) of Debtor to be worth $254,288.49 in January of 2012.[4]  The Trustee sold the intangible property, including the "distributor list," for $150,000, together with the assumption of debt, release of bankruptcy claims and payment of royalties.[5]

Nonetheless, the Trustee argues that the "distributor list" is worth millions, but he comes to this conclusion by Scott Weingust's valuation of Debtor's "distributor network."[6]  To explain the difference between "distributor network" and "distributor list," Steve Redman, a lawyer, former owner and officer of Debtor, AmeriSciences, L.P.,[7] testified as follows:

> **Q  And you've used the term "network marketing" a couple of times….  would it be correct to equate that to a multi-level marketing or MLM-type business?**
>
> **A.** Yes.  I interchange the names.  But, yeah, they're essentially the same thing. Just depends on who you ask.  But they're all the same form of multi-tiered commission structures…
>
> **Q. And the distributor network is, in a sense, your salespeople; right?**
>
> A    Correct.  It's salespeople and customers.[8]
>
> **Q  Now, in the litigation, we've been using this term of art, distributor list.**
>
> A. Um-hum.
>
> **Q. And I kind of view it as the amalgam of distributor information.  Does the term "distributor list" mean anything to you or have any meaning to you?**
>
> A. A distributor list would generally be just a printout of all the distributors in the downline, where they were in your downline, and maybe even the volume for the month or for the year.[9]

---

[4] Redman Dep. 211:3-216:18; Grace Dep. 129:17-131:5; Grace Dep. Ex. 96.
[5] Grace Dep. Ex. 99.
[6] Ex. A to the Trustee's Response; Para. 14 ("I have conclude that the value of the Distributor Network as of April 19, 2012 is equal to $3.46 million…").
[7] Redman Dep. 15:9-24; 19:10-20:13; 23:19-24; 195:8-15.
[8] Redman Dep. 13:1-14:6.
[9] Redman Dep. 129:6-15.

**Q. – [If[ AmeriSciences is paying its bills to its distributors, so long as there's a company, those distributors have a contractual obligation to distribute -- to the company; right?**

A. That is true.

**Q. Okay.  Whether or not a list is transmitted or not, that did not alienate the distributors from the company.  The list did not -- transmitting list doesn't -- the distributors didn't say, Oh, I've got to follow that list.**

A. It's one component as to help someone else identify who is in the network, though…

**Q. Okay.  So transmission of a network or a list of people's names does not equal transfer of a network; right?**

A. Correct.[10]

Debtor did not lose its "distributor network" through an e-mail.  Instead, Debtor's distributors followed "Barry [Cocheu] and Lou [Gallardo]" (and other master distributors) from network marketing company to network marketing company (from WIN to NetSalon to AmeriReach to AmeriSciences and then to Organo Gold).[11]  When "Barry and Lou" left, Debtor's network marketing business was gone.[12]  Mr. Redman explained that:

**Q. And so you feel like the end came when Barry and Lou called it quits and left because they were the ones who carried the water for that company?**

A. I think the product developer and I could have kept it going in a -- one form or another, not a network marketing company, but the network marketing aspect. As soon as Lou and Barry both would leave, other distributors would go with, whether they took them or not.[13]

The Trustee on page 5 of his response argues Debtor prohibited distributors from recruiting to other businesses.  Actually, Mr. Redman testified that:

**Q. Okay.  In there, you're explaining that your policy is to -- is that you don't have a problem with people taking their personally sponsored IMCs with them; right?**

---

[10] Redman Dep. 263:12-264:11.
[11] Redman Dep. 32:8-24; 281:5-24; Redman Dep. Ex. No. 86.
[12] Redman Dep. 303:20-304:4; 265:7-266:18; 262:6-13;
[13] Redman Dep. 258:23-259:3.

A. Right.  It's in our policies and procedures, they can do it.

**Q. Okay.  So you don't have any issue of people taking their own IMCs with them when they leave?**

A. Correct.[14]

Contrary to the Trustee's citation, Mr. Redman described Debtor's "anti-solicitation provision" as follows:

**Q. Okay.  This provision, is this an anti-solicitation provision?  How would you phrase -- classify this provision?**

A. It is -- yeah.  I mean, it's anti-solicitation. They're not allowed to solicit distributors that they didn't personally bring into the business, into other companies.[15]

And, Holton Buggs did not testify as cited by the Trustee regarding such conduct as being unethical.  Instead, Mr. Buggs testified as follows:

**Q. Is – is that – is the acquisition of distributors from MLM companies by another MLM company a problem in the multi-level marketing world, for lack of a better term?**

A. Define – define what you mean by the "acquisition of distributors," because I'm not – I want to make sure that we're talking about the same thing.

**Q. Signing up of distributors who are currently signed up as distributors of other MLMs.**

A. Is it a problem?

**Q. Yeah.**

A. I thing that depends on – I thing that depends.

**Q. It depends on whether you're losing them or gaining them?**

A. No. I think it depends on the company.  Distributors in Organo can sign up in another company. We have no problem with it, so –[16]

The Trustee argues that the "distributor list" is a trade-secret because of restricted access.

However, testimony establishes unrestricted access; distributors had access to their downlines,

---

[14] Redman Dep. 253:1-17.
[15] Redman Dep. 59:3-9.
[16] Buggs Dep. 97-1-18.

accounting and customer service had complete access to the information; warehouse employees had limited access; nothing prevented distributors from exporting and cutting and pasting the information for use elsewhere.[17]

George Skirm, the individual who sent the "distributor list" testified as follows:

A. And if these people would have gone on the back office and they would have taken their downline and they would have personally sent it over to Organo, while I may have agreed or disagreed with that, it wouldn't involve me personally sitting at this table.

**Q. And that wouldn't have been the transfer of protected information because that would have been the transfer of information that they had access to?**

A. Correct…

**Q. You agree with that?**

A. I agree with that.

**Q.   So your disagreement is that the master list was sent, but that you agree that these individuals could have transferred all their downline information to Organo Gold?**

A. They could have.

**Q. And I think that's an important point because, basically, the concern is, as I understand it, not that the contact information was transferred, because that could have gone over to Organo Gold any of many which ways, the concern is that the personal information such as Social Security numbers, et cetera, went over, right?...**

A. I would agree with that statement.

**Q. Okay. And what monetary value does a Social Security number have to Organo Gold, if you know?**

A. I have -- I couldn't even speculate on that, but, I mean, you just -- you hear about it in the media all the time, about protecting, you know, people's personal information, credit card information, Social Security.  You've got, you know, identity theft and all these other kinds of things.  I mean, that's just -[18]

---

[17] Redman Dep. 66:9-67:2 ("I mean, we gave our distributors access to as much information as possible."); 126:19-127:7 ("The warehouse… employees could see just a limited amount.  The customer service department… could see everything… our programmer could see everything and our accounting could see everything if they wanted to.  And I could see everything.  And Lou and Barry could see everything."); Skirm Depo 19:18-24; Skirm Depo 20:21-21:1; Skirm Depo 143:7-24; 146:9-147:11; 157:21-158:4; 162:2-24; Skirm Depo 40:15-19; Skirm Depo 162:2-24; Skirm Depo 25:6-27:15; 37:9-14.
[18] Skirm Dep. 146:9-147:20.

Further, the Trustee argues as "Relevant Fact" on page 8 of his response that "[t]he Organo Defendants, however, were never interested in an above-board purchase of Amerisciences or its assets."  Mr. Buggs' cited testimony does not support such a statement; Mr. Buggs actually testified as follows:

**Q. You were never interested in acquiring AmeriSciences, fair?**

A. Fair.

**Q. You were, however, interested in adding Barry and Lou to your network, fair?**

A. Fair.[19]

Turning to the Trustee's argument that the sale of assets never included claims against Defendants, the (former) Trustee at deposition testified as follows:

A. I negotiated with Carlos Montecino, on behalf of Supplement Group, and Tom Graves, their lawyer, for the transfer of the inventory and the existing patents, the pending application for patents, that relayed intellectual property to them.

Their concept was, they were going to try a different business model than AmeriSciences, but, under all circumstances, I would retain the claims and causes of action under the bankruptcy code.  It's called the avoidance actions.  And that was the purpose of the sale -- to, frankly, bring in some money from the liquidation of the personal property and whatever value I could talk them into paying for on the patents and the other intellectual property...

That was their intention and that was my intention, and that's what we did.[20]

**Q. Mr. Grace, before we look at this and just to clarify, in the asset sale that occurred under your watch and negotiated by you, consummated by you, driven by you, what assets were sold by the estate?**

A. The inventory, the patents, trademarks – I don't recall if there were any registered copyrights – and the right to use those and the right to defend them in the event that somebody in the future were to violate those intellectual rights.[21]

Mr. Grace's testimony is entirely consistent with the Bankruptcy Court's May 9, 2013 Order selling Debtor's assets, which defines "Assets" as follows:

---

[19] Buggs Dep. 49:4-9.
[20] Grace Dep. 45:19-46:14.
[21] Grace Dep. 47:11-19.

Supplement Research and Development LLC… offers to purchase [Debtor's] General Intangibles and Intellectual Property…Except as provided below, ***the Assets do not include Chapter 5 causes of action or accounts receivable***.

**"General Intangibles"** means all of Company's… "general intangibles" (as defined in Article 9) of every kind and description, and including all… ***programs and software*** … Intellectual Property…

**"Intellectual Property"** means Core Intellectual Property, Other Intellectual Property and Intellectual Property Agreements.

**"Core Intellectual Property"** means… ***copyrights***… and all rights relating to any of the foregoing… and rights to sue…

**"Intellectual Property Agreements"** means ***personal services contracts, employment contracts, confidentiality agreements and similar covenants and agreements, rights under agreements not to compete and similar covenants and agreements***…

**"Other Intellectual Property"** means… ***trade secrets, know how, shop rights… distributorships, and customer lists… and all rights to sue for past, present or future violations or infringements of any of the foregoing***…[22]

## C. Argument

***Trustee Sold All But Chapter 5 Claims***

The Bankruptcy Court's May 9, 2013 Order unambiguously provides for the sale of all but Chapter 5 claims. The United States Supreme Court explained bankruptcy court order interpretation as follows:

> But be that as it may, where the plain terms of a court order unambiguously apply, as they do here, they are entitled to their effect. *See, e.g., Negron-Almeda, v. Santiago,* 528 F.3d 15, 23 (1st Cir. 2008) ("[A] court must carry out and enforce an order that is clear and unambiguous on its face"); *United States v. Spallone,* 399 F.3d 415, 421 (2d Cir. 2005) ("[I]f a judgment is clear and unambiguous, a court must adopt, and give effect to, the plain meaning of the judgment" (internal quotation marks omitted)). If it is black-letter law that the terms of an unambiguous private contract must be enforced irrespective of the parties' subjective intent, see 11 R. Lord, Williston on Contracts § 30:4 (4th ed.1999), it is all the clearer that a

---

[22] Grace Dep. Ex. 99 (Emphasis added).

court should enforce a court order, a public governmental act, according to its unambiguous terms.

*Travelers Indemnity Co. v. Bailey*, 557 U.S. 137, 150-51 (2009).

The order conveys all but Chapter 5 transfer claims; subjective intent is irrelevant. Mr. Grace's deposition testimony is consistent with the order. Accordingly, the Trustee's claims for trade secret misappropriation, conversion, tortious interference with contract, aiding and abetting breach of fiduciary duty, unjust enrichment and the Texas Uniform Fraudulent Transfers Act must be dismissed as a matter of law.

### No Trade Secret

Argument does not make the "distributor list" a trade-secret. Summary judgment fact establishes distributors' access[23] and public disclosure of the "distributor list".[24] There is no dispute that the information consisted of the distributors' general skills, knowledge and information from other network marketing businesses.[25] The "distributor list" is not a trade secret. *Philip H. Hunke, D.D.S., M.S.D., Inc. v. Wilcox*, 815 S.W.2d 855, 858 (Tex. App.—Corpus Christi 1991, writ denied); *A.M. Castle & Co. v. Byrne*, 123 F. Supp. 3d 895, 901-02 (S.D. Tex. 2015).

### No Chapter 5 Transfer

To be entitled to a recovery, the Trustee must establish the diminishment of value of property of Debtor's estate resulting from a transfer of property for less than equivalent value. *In re Jeffrey Bigelow Design Group*, 956 F.2d 479, 485 (4th Cir. 1992).

---

[23] Skirm Dep. 162:1-19 ("Q. Okay. And to that end, you did not employ any software or any devices to prevent people from seeing all their downline contact information and exporting it, correct? Nothing prevented that? A. That is correct. It was by design even.").

[24] Skirm Dep. 142:9-18 ("Q. This was an e-mail from you or from Barry to you, right? A. Yes. Q. And basically, this e-mail says the downline information that includes Kroos, Wilson, Henderson, Wascovich, Giammalva, Fertig and Heitman was being -- was -- was being sent out, right? A. Yes.")

[25] Redman Dep. 32:8-24; 281:5-24; Redman Dep. Ex. No. 86.

There is no summary judgment evidence of an avoidable transfer of software; there is evidence of Debtor's license of software to Organo Holdings, Limited, and the failure of a condition precedent to payment under the software license agreement.[26]

There has been no transfer of a trade-secret to Defendants.  Yet, even if intangible property is conceivably transferred to Defendants, which is denied, the financial records establish the intangible property of Debtor to be worth $254,288.49 in 2012.[27]  The Trustee sold the intangible property for $150,000 and recovered $115,000[28] from Co-Defendants in this action. So, transfer claims against Defendants are barred as the Trustee received at least $265,000 for assets worth $254,288.49. 11 U.S.C. § 550(d) ("The trustee is entitled to only a single satisfaction…").

Finally, a "distributor network" is not property of Debtor's estate subject to transfer. *See, e.g. In re 3dfx Interactive, Inc.,* 389 B.R. 842, 875-80 (N.D. Cal. 2008) ( The Court declined to find a transfer of a workforce.).

### D.  Conclusion

The Trustee tries mightily to find misconduct and damage where there is none and asserts claims that do not belong to him.  There is no foul play, only a restructuring of a business away from the network marketing model. The Trustee's claims must be dismissed because of the sale of claims, the non-existence of a "trade-secret," no transfer of a "distributor network," and no diminishment of Debtor's estate.

WHEREFORE, Defendants ask the Court to enter final summary judgment dismissing the Trustee's claims against them, and for such other and different relief to which they may be entitled.

---

[26] Skirm Dep. 120:21-126:10; 190:20-25; 191:23-193:17; 199:11-16; Skirm Dep. Exhibit No. 16.
[27] Grace Dep. 129:17-131:5; Grace Dep. Ex. 96.
[28] Grace Dep. Ex. 99; Doc. Nos. 209-210; Case No. 12-27545.

Respectfully submitted,

**NICHAMOFF LAW, P.C.**

/s/ Seth A. Nichamoff

_____

Seth A. Nichamoff
State Bar No. 24027568
Fed. I.D. No. 27002
2444 Times Boulevard, Suite 270
Houston, Texas 77005
(713) 503-6706 Telephone
(713) 360-7497 Facsimile
seth@nichamofflaw.com

-and-

**JAMIE KING, P.C.**

Jamie King
Teas State Bar No. 24043755
S.D. Texas Bar No. 566838
P.O. Box 5757
Kingwood, Texas 77325
(713) 521-6558 Telephone
(888) 247-0443 Facsimile
jamie@jamiekingpc.com

**ATTORNEYS FOR DEFENDANTS HOLTON BUGGS
ORGANO GOLD INT'L, INC. AND ORGANO GOLD
ENTERPRISES, INC.**

11

## CERTIFICATE OF SERVICE

I hereby certify that on Wednesday, November 15, 2017, a true and correct copy of the foregoing was forwarded to the following counsel of record pursuant to the Federal Rules of Federal Procedure and the Local Rules of the United States District Court for the Southern District of Texas.

Steven R. Rech, Esq.
Kari B Coniglio, Esq.
John J. Sparacino, Esq.
Vorys, Sater, Seymour and Pease L.L.P.
700 Louisiana Street, Suite 4100
Houston, Texas 77002
srech@vorys.com
kbconiglio@vorys.com
jjsparacino@vorys.com

*Attorneys for Plaintiff Thomas H. Grace, Chapter 7 Trustee*

David W. Anderson, Esq.
Law Office of David W. Anderson
P.O. Box 649
Leander, Texas 78646
dwanderson@ralaw.net

*Attorney for Defendants Barry Cocheu and Kara Cocheu*

Margaret Maxwell McClure, Esq.
Attorney at Law
909 Fannin, Suite 3810
Houston, Texas 77010
margaret@mmmcclurelaw.com

Thomas H. Grace, Esq.
Vorys, Sater, Seymour and Pease L.L.P.
700 Louisiana Street, Suite 4100
Houston, Texas 77002
thgrace@vorys.com

*Attorneys for Debtor AmeriSciences, L.P.*

/s/ Seth A. Nichamoff
_____
Seth A. Nichamoff

12